**MAGIC TOYOTA, INC. and David
B. Jones, Plaintiffs,**

**v.**

**SOUTHEAST TOYOTA DISTRIBUTORS,
INC.; J.M. Family Enterprises, Inc.;
Tender Loving Care Corp.; World
Omni Financial Corp.; World Omni
Leasing, Inc.; Joyserv Co., Ltd.; John
McNally, as trustee of the dissolved corporation Carnett–Parsnett Systems,
Inc.; Toyota Motor Sales U.S.A., Inc.;
Toyota Motor Co., Inc.; Toyota Motor
Credit Corp.; James Moran, Individually; John McNally, Individually; Al
Hendrickson, Individually; Janice Moran, Individually; James M. Moran, Jr.,
Individually; Pat Moran, Individually;
and Arlene McNally, Individually, Defendants.**

**Civ. A. No. 2:91–1031–18.**

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 21, 1992.

308

Raymond R. Bergan, Douglas R. Marvin, Daniel F. Katz, Philip B. Busch, Washington, D.C., Morris D. Rosen, H. Brewton Hagood, Charleston, S.C., Stephen G. Morrison, Nina Nelson Smith, Arthur L. Coleman, Julie Jeffords–Moose, Columbia, S.C., for plaintiffs.

Douglas R. Abrams, Donald B. Stickland, Raleigh, N.C., William C. Clark, Hilton Head, S.C., for defendants.

## ORDER

NORTON, District Judge.

This matter is before the Court on a motion to dismiss for lack of personal jurisdiction and improper venue filed by defendants James Moran, Janice Moran, James Moran, Jr., Patricia Moran, John McNally, Arlene McNally and Al Hendrickson and a motion for summary judgment filed by all defendants.[1]

## BACKGROUND

In the 1960's, defendant James Moran established a company named Southeast Toyota Distributors ("SET"), a Toyota distributorship for several Southeastern states, including South Carolina. SET enfranchises Toyota dealers within its region and distributes Toyota vehicles, parts and accessories to those dealers. After starting SET, James Moran's business blossomed and he later established several other complementary companies, including defendants Tender Loving Care Corporation ("TLC"),[2] World Omni Financial Corporation ("WOFCO"),[3] World Omni Leasing, Inc. ("WOLI"),[4] JoyServ Company ("JoyServ"),[5] Carnett–Parsnett Systems, Inc. ("Carnett")[6] and J.M. Family Enterprises ("JMFE").[7] These companies (collectively referred to as the "JM Family") provide financing, insurance and other products relating to the distribution and sale of Toyotas.

James Moran's business is a family business. Several of James Moran's children and other relatives are involved in the business and are named as defendants in this lawsuit. His daughters Patricia Moran and Arlene McNally, son James Moran, Jr., son-in-law John McNally and wife Janice Moran, are all involved in the JM Family and are being sued individually. The degree of corporate participation varies among the family members. Some are executives in the business, while others are merely minority stockholders and directors of some of the companies. Other defendants include Al Hendrickson, a long-time executive with SET, now in business for himself; Toyota Motor Sales, U.S.A. ("TMS"), the United States importer and distributor of Toyota vehicles; Toyota Motor Credit Corporation ("TMCC"), a finance company associated with TMS; and Toyota Motor Company ("TMC"), TMS's parent company and provider to TMS of the vehicles.[8]

In 1986, plaintiff David Jones, then a Florida resident, purchased a Toyota dealership in Beaufort, South Carolina, which he renamed Magic Toyota. The dealership is also a plaintiff in this case. Mr. Jones, who claims that he was not interested in opening a dealership in Beaufort, but in Hardeeville, South Carolina, alleges that SET induced Jones to buy the Beaufort dealership with the promise that he would be able to move the business to Hardee-

---

**1.** Defendants also filed a motion to dismiss the civil RICO counts of the complaint. At the hearing on these motions, this Court issued a RICO Case Order, requiring plaintiffs to set forth their RICO claims with particularity and specificity. The Court tabled the motion to dismiss the RICO claims pending compliance with the RICO Case Order and accordingly will not address that issue in this Order.

**2.** TLC is a warranty company which provides extended warranty contracts to SET's Toyota dealers who in turn sell the warranty contracts to Toyota buyers.

**3.** WOFCO provides financing to some of SET's dealers for the purchase of their vehicle inventory from SET and also provides some retail installment financing to those dealers' customers.

**4.** WOLI is a leasing company that provides consumer leasing plans for retail customers of SET's dealers.

**5.** JoyServ is the port processing subsidiary of SET. It receives Toyota vehicles from Japan, and cleans, accessorizes and ships those vehicles to SET's dealers.

**6.** Carnett provided computer processing services for the JM Family until 1988.

**7.** JMFE is the parent company of the other Moran entities.

**8.** TMS sells new Toyota vehicles manufactured in Japan or in the United States to SET for resale to dealers in SET's region.

ville. In reliance on this promise, alleges Mr. Jones, he bought the dealership and agreed to use WOFCO as his wholesale financing source. Mr. Jones claims that once in the grip of James Moran and his "family," he learned that James Moran did not run his businesses in a lawful way. Mr. Jones claims that the JM Family sought to control its dealers and to coerce them to commit unlawful business activities. Once the JM Family determined that it could not control Mr. Jones, he alleges, it set out to destroy his dealership, which closed in 1989.

Following the demise of his dealership, Mr. Jones and Magic Toyota filed the instant action, alleging that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and alleging four state claims: breach of contract, fraud, unfair trade practices and violation of the Automobile Dealers Day in Court Act, S.C.Code Ann. § 56–15–20. The seven individual defendants now move to dismiss this action as to them for lack of personal jurisdiction and improper venue. All of the defendants move for summary judgment based on Res Judicata and Collateral Estoppel. The Court turns first to the motion to dismiss for lack of personal jurisdiction.

## ANALYSIS

### I. PERSONAL JURISDICTION

Defendants James Moran, Janice Moran, James Moran, Jr., Patricia Moran, John McNally, Arlene McNally and Al Hendrickson (the "Individual Defendants") contend that service of process was not authorized by any federal rule or statute, nor does it meet Due Process requirements, and therefore, service upon them was invalid, and this Court lacks personal jurisdiction over them.

Before this Court may exercise personal jurisdiction over the Individual Defendants, the procedural requirement of service of summons, as set forth in Federal Rule of Civil Procedure 4(e), must be satisfied. *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). Rule 4(e) provides that a feder-al court may exercise jurisdiction over non-resident defendants if the service complies with either a federal or state statute authorizing service on non-resident defendants. Of course, aside from the procedural requirements, Due Process requirements must also be met before a court can exercise personal jurisdiction.

When a court's personal jurisdiction over a defendant is contested, the plaintiffs have the burden of showing that such jurisdiction exists. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936). Where, as here, there has been no evidentiary hearing and the Court proceeds upon the written submissions, plaintiffs must make only a prima facie showing that jurisdiction exists. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989). While plaintiffs' written allegations of jurisdictional facts are generally construed in their favor, *see id.* and *Kowalski v. Doherty, Wallace, Pillsbury & Murphy*, 787 F.2d 7, 9 (1st Cir.1986), their showing of personal jurisdiction must be based on specific facts set forth in the record in order to defeat defendants' motion to dismiss. "In reviewing the record before it, a court may consider pleadings, affidavits, and other evidentiary materials without converting the motion to dismiss to a motion for summary judgment." *VDI Technologies v. Price*, 781 F.Supp. 85, 87 (D.N.H.1991). *See also Wilson–Cook Medical, Inc. v. Wilson*, 942 F.2d 247, 252 (4th Cir.1991). Plaintiffs assert that the RICO statute authorizes nationwide service of process and thus meets the Rule 4(e) requirement. Plaintiffs additionally look to the South Carolina Long Arm Statute, S.C.Code Ann. § 36–2–803, and the South Carolina Automobile Dealers Day in Court Act, S.C.Code Ann. § 56–15–20 as statutory sources of personal jurisdiction. The Court first addresses the federal statute upon which plaintiffs rely.

#### A. Section 1965(b) of RICO

Section 1965(b) of RICO states, in part:

In any [civil RICO] action ... in any district court of the United States in

which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

 This section enables a plaintiff to bring before a single court for trial all alleged members of a nationwide RICO conspiracy. By authorizing nationwide service of process, the provision operates in some cases to confer personal jurisdiction over defendants who would not otherwise be within the court's jurisdictional reach. *Butcher's Union Local No. 498, United Food and Commercial. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir.1986) and *Anchor Glass Container Corp. v. Stand Energy Corp.*, 711 F.Supp. 325, 330 (S.D.Miss.1989).

The parties apparently agree that § 1965(b) ensures that at least one court will have jurisdiction over all RICO defendants. The parties disagree, however, as to when "the ends of justice require" a court to exercise personal jurisdiction in a particular case, pursuant to § 1965(b). Defendants contend that the Ninth Circuit's *Butcher's Union* decision properly interprets Congress' intent as to the meaning of the phrase. In that case, the Ninth Circuit adopted a rigid test. It held, "[f]or nationwide service to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Butcher's Union* at 539. Defendants contend that a Florida court would have personal jurisdiction over all of the defendants in this case, and that therefore, under the *Butcher's Union* analysis, this Court cannot exercise personal jurisdiction unless it can look to another statute for support.

Espousing a more liberal reading of § 1965(b), plaintiffs urge the Court to use a "totality of the circumstances" approach when deciding whether the ends of justice require extending personal jurisdiction. The circumstances in this case dictate that this Court should extend jurisdiction, argue plaintiffs. The following circumstances are present here, according to plaintiffs: (1) the Individual Defendants would experience no substantial hardship in defending this case in South Carolina; (2) the Individual Defendants would have to come to South Carolina to testify anyway; (3) the Individual Defendants are horrible people who have committed horrible acts in violation of the RICO statute; and (4) it would be unfair to force plaintiffs to leave their "home" state to assert their claims against defendants. In plaintiffs' own words, "Defendants engaged in repulsive and reprehensible behavior. RICO was enacted in order to prevent a conspiracy of corrupt persons from having free reign to ravage the citizens of various States with illegal and fraudulent conduct.... [T]o deny Plaintiffs a forum in the very state where they were forced out of business would in no way serve the 'ends of justice.'" Plaintiffs' memorandum in opposition to defendants' motion to dismiss for lack of personal jurisdiction ("Plaintiffs' Memorandum"), page 10.

 The Court agrees that the Ninth Circuit's interpretation of § 1965(b) is too restrictive. However, plaintiffs' interpretation would have this Court determine whether to extend personal jurisdiction for completely unwarranted reasons, and trample upon our traditional principles of jurisprudence.[9] While this Court does not believe that the availability of an alternative forum should be the sole factor in determining whether the ends of justice require extending personal jurisdiction, this Court believes that the existence of another district in which all of the defendants would be subject to personal jurisdiction is an important factor to consider.

9. Plaintiffs' factors 1, 2 and 4 are more appropriately analyzed under a 28 U.S.C. § 1404 request for change of venue, while the third factor has nothing to do with a personal jurisdiction analysis.

The importance placed on this factor by the courts is evidenced in *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668 (7th Cir. 1987), *cert. den'd*, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988) and *Anchor Glass*. While the courts in these cases did not go so far as to adopt the *Butcher's Union* interpretation, they evidently placed much importance on the existence of an alternative forum in which personal jurisdiction over all defendants in deciding whether the ends of justice required extending personal jurisdiction in those cases. In both cases, an alternative district would have had personal jurisdiction over all defendants, and in both cases the courts declined to extend personal jurisdiction to the defendants.

█ In this case, defendants contend that a federal court in Florida would have personal jurisdiction over all of the defendants. Plaintiffs have not disputed this claim, and the Court has nothing before it to persuade it otherwise. While the Court recognizes that it would be less convenient for Mr. Jones to litigate his claims in Florida, it notes that the two majority shareholders in Magic Toyota are residents of Florida.[10] In the face of evidence that an alternative forum is available, and in the absence of any evidence, other than convenience to the plaintiff, that justice requires haling to this district persons otherwise not amenable to suit in South Carolina when an alternative forum is available, this Court declines to extend personal jurisdiction pursuant to § 1965(b). The RICO provision endeavors to ensure that at least one forum is available to a plaintiff litigating RICO conspiracy claims, and given the availability of the federal courts in Florida, this ruling does not contravene the provision's purpose.[11]

**10.** Defendants introduced evidence, undisputed by plaintiffs, that Mr. Jones transferred a majority of shares in Magic Toyota to Messrs. Pohle and Henry, both of whom are Florida residents, and has assigned to them certain proceeds from this litigation.

**11.** Of course, even if a federal statute such as § 1965(b) were to serve as a means of procuring personal jurisdiction, plaintiffs would still have

### B. The South Carolina Long–Arm Statute

█ Plaintiffs also look to the South Carolina Long–Arm Statute, S.C.Code Ann. § 36–2–803, as a means of asserting personal jurisdiction over defendants. Under this statute, South Carolina's jurisdiction extends to the Due Process limits. *Atlantic Soft Drink Co. of Columbia, Inc. v. South Carolina Nat'l Bank*, 287 S.C. 228, 336 S.E.2d 876, 878 (1985). It is, therefore, unnecessary in this case to go through the normal two-step formula of examining first the validity of the service under the statute of the forum state. Our inquiry is limited to whether an exercise of jurisdiction over each Individual Defendant under the circumstances of this case is consistent with Due Process since the test of amenability under the state law and under the constitutional test are identical. *Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052 (4th Cir.1983), *cert. den'd*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984).

█ The Fourteenth Amendment Due Process Clause forbids the exercise of personal jurisdiction over a non-resident defendant when the exercise of such jurisdiction violates traditional notions of substantial justice and fair play. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). This standard dictates that a court cannot exercise personal jurisdiction over a defendant who has not established certain "minimum contacts" with the forum state. *Burger King*, 105 S.Ct. at 2183.

█ In order to establish that a nonresident defendant has had minimum contacts with the forum state, plaintiffs must show a "sufficient connection between the defendant and the forum State to make it

to satisfy the Fifth Amendment Due Process requirements before this Court could exercise personal jurisdiction over the Individual Defendants. However, because the Court has found that it should not exercise personal jurisdiction in this case pursuant to § 1965(b), the Court need not enter into a Fifth Amendment Due Process analysis.

fair to require defense of the action in the forum." *Kulko v. California Superior Court,* 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978). Plaintiffs may satisfy this burden if they show that there has been some act related to the cause of action alleged by which each non-resident defendant purposefully availed himself or herself of the privilege of conducting activities within the forum state. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–1240, 2 L.Ed.2d 1283 (1958).

When analyzing this case to determine whether Due Process requires that this Court extend personal jurisdiction over the Individual Defendants, the Court must consider each defendant separately, not collectively as plaintiffs have done in their Memorandum. Because plaintiffs have failed to set forth in their Memorandum the facts they rely upon in asserting that this Court has personal jurisdiction over the Individual Defendants, the Court must look beyond the memoranda to the Amended Complaint and any affidavits submitted by defendants.[12]

### 1. Janice Moran, James Moran, Jr., Patricia Moran and Arlene McNally

■ First, the Court examines the contacts that Janice Moran, James Moran, Jr., Patricia Moran and Arlene Moran have had with South Carolina. In their Amended Complaint, plaintiffs allege that these defendants are citizens and residents of Broward County, Florida, that they are or have been officers and or directors of some of the defendant corporations and that as such, they "benefitted from the illegal and wrongful misconduct described in this Complaint and participated in the misconduct to the extent described hereinafter." Paragraph 10, Amended Complaint.

Upon a search of the Amended Complaint for allegations that these defendants had contact with this forum or even participated in the alleged unlawful activities, the Court was only able to find a few vague, conclusory references to these defendants. Paragraph 219(b) alleges, "Defendant JM

FAMILY actively participated in the creation and execution of the fraudulent schemes by and through its President McNally and Chairman of its Board of Directors Moran, and by and through several of its other officers and directors that are also officers and directors in its subsidiary Defendant corporations and which actively assisted those subsidiary Defendants in creating and executing the schemes." This paragraph does not enlighten the defendants or this Court as to the identities of the officers and directors referenced nor does it state whether these officers and directors are the named defendants. Furthermore, these allegations are vague and conclusory and do not set forth sufficient facts such that this Court can discern any contacts with this forum.

The other paragraphs alleging participation by these defendants fall under the Amended Complaint's RICO count. Paragraph 247 alleges that all but Janice Moran are "persons" as defined by § 1961(3) of RICO. Paragraph 248 alleges that each of the defendants are engaged in interstate commerce, involving the distribution and financing of Toyota vehicles in South Carolina and other states. Paragraph 250 alleges that all of the defendants were associated in fact and formed an enterprise as defined by § 1961(4) of RICO for the purpose of distributing and financing Toyota vehicles in South Carolina. Paragraph 254, without specifically naming the defendants, alleges that each defendant has received income from a pattern of racketeering activity and that the defendants used and invested the income in the operation of the described enterprises in violation of § 1962(a). Finally, paragraph 258 alleges that Janice Moran, James Moran, Jr., Patricia Moran and Arlene McNally violated § 1962(a) "in the manner described in the complaint."

While plaintiffs have made several conclusory allegations regarding Janice Moran, James Moran, Jr., Pat Moran and Arlene McNally, they have failed not only to back up these statements with specific,

**12.** Plaintiffs have submitted no affidavits or other evidence in support of their argument that

this Court has personal jurisdiction over the Individual Defendants.

supporting facts, but also, and most importantly for purposes of the pending motion, they have failed to show how these defendants subjected themselves to personal jurisdiction in South Carolina. Plaintiffs have not made even one allegation that any of these defendants has ever purposely availed himself or herself of the privilege of conducting activities within the State of South Carolina.

On the other hand, defendants assert in their memorandum in support of their motion to dismiss ("Defendants' Memorandum") that none of these defendants has ever lived in South Carolina; none has ever personally maintained an office, a telephone listing, or bank account in South Carolina; none has ever employed any individual or agent in South Carolina; and none has ever personally entered into a contract to be performed in South Carolina, or solicited or operated any personal business in the State. The Individual Defendants also submitted affidavits to that effect. *See* Defendants' Memorandum, Exhibit A.

Plaintiffs' only response to defendants' assertion that the requisite minimum contacts do not exist as to these defendants is to educate the Court as to the hideously unlawful and egregious acts of defendants. Not once do plaintiffs even attempt to address the acts committed by *each* defendant and the contacts each defendant has had with South Carolina, but instead insist on referring to defendants collectively. Without any evidence before it that Janice Moran, James Moran, Jr., Pat Moran and Arlene McNally made the minimum contacts required by the Fourteenth Amend-ment, this Court cannot exercise personal jurisdiction over these defendants.[13] Accordingly, defendants' motion to dismiss these defendants from this action is granted, pursuant to Federal Rule of Civil Procedure 12(b)(2).

### 2. James Moran, Al Hendrickson and John McNally

■ The Court next addresses the remaining Individual Defendants: James Moran, Al Hendrickson and John McNally. Defendants acknowledge that these defendants have had the requisite minimum contacts with South Carolina, but nevertheless claim that they are not subject to personal jurisdiction in this forum. This is so, assert defendants, because the acts which comprise those contacts were taken on behalf of their corporate employers. Defendants contend that, under the "fiduciary shield doctrine," it would be unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.[14] *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 (2d Cir.1981) and *United States v. Montreal Trust Co.*, 358 F.2d 239 (2d Cir.), *cert. den'd*, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966).

The Fourth Circuit addressed this argument in *Columbia Briargate*. Distinguishing those cases which have applied the fiduciary shield doctrine, the court concluded that it may have personal jurisdiction over an individual non-resident employee based on acts he performed on behalf of his employer under certain circumstances. *Columbia Briargate* at 1060.[15] The Fourth

---

**13.** Plaintiffs also look to the South Carolina Automobile Dealers Day in Court Act, S.C.Code Ann. § 56–15–20, as a source of personal jurisdiction. However, regardless of whether this Act applies to these defendants, the Due Process requirements of the Fourteenth Amendment must still be satisfied before personal jurisdiction can be extended. These requirements have not been met, as is explained above.

**14.** The doctrine of fiduciary shield "emerged with little notice and with no critical examination as a novel principle by way of dicta in a series of decisions of the New York state and federal courts in the mid-sixties just as a more liberal and relaxed rule was developing in federal courts in favor of the application of state long-arm statutes themselves." *Columbia Briargate* at 1055.

**15.** Quoting *Idaho Potato Comm'n v. Washington Potato Comm'n*, 410 F.Supp. 171 (D.Idaho 1975) favorably, the Fourth Circuit stated that "it was proper under the principles of 'fair play' and 'substantial justice' to hold that a corporation which engages in activities having foreseeable ramifications beyond the state in which it is physically present may have sufficient connection or 'contacts' with a distant forum where the ramifications are felt but that it is quite another

Circuit held explicitly that an individual may be subject to personal jurisdiction in a particular forum if he commits a tort in the forum, regardless of whether the commission is on behalf of his employer. *Id.* Less clear from *Columbia Briargate* is whether an individual defendant may also be subject to jurisdiction if he does not commit the wrong in the forum state but has reason to foresee responsibility in the forum state for wrongful acts committed outside the forum state.

Defendants would have the Court read *Columbia Briargate* quite restrictively, as requiring that the individual defendants actually commit the acts complained of within the state. This Court does not read *Columbia Briargate* so narrowly. Although the Fourth Circuit did not need to reach the question of whether an individual defendant who does not actually commit the wrongful action in the forum state may otherwise be amenable to suit there[16], the court did give some guidance on the issue. It favorably quoted the First Circuit, which held, "[w]hat is required is some showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury." *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir. 1980). Such direct personal involvement typically exists "where the defendant [agent is] the guiding spirit behind the wrongful conduct, or the central figure in the challenged corporate activity." *Id.* at 902. *See also Calder v. Jones*, 465 U.S. 783, 789–790, 104 S.Ct. 1482, 1486–1487, 79 L.Ed.2d 804 (1984) (where, in a libel action, the Court held defendants subject to personal jurisdiction because (1) their intentional actions were aimed at the forum state, (2) they knew their article libeling plaintiff was likely to have a devastating impact on plaintiff, and (3) they knew the brunt of the injury would be felt by the plaintiff in the forum state).

This test, which somewhat mirrors the general rule set forth in *Burger King* that a defendant who has never entered the forum state may still be subject to personal jurisdiction in that state, makes much sense. It is inconceivable that a corporate employee who cleverly refrains from committing tortious acts in the forum state can evade being haled into court there, while a less savvy employee, who commits the acts in the forum state, may be haled into court there, where both employees are acting on behalf of their employers with the purpose of injuring the plaintiff residing in the forum state. An agent who takes purposeful and calculated action against a plaintiff in a particular forum, fully conscious of the consequences of his actions, should be amenable to suit in that forum.

It is unclear whether plaintiff alleges that any of the three remaining Individual Defendants committed any unlawful actions in South Carolina. However, plaintiffs do appear to assert that these defendants had reason to foresee responsibility in South Carolina for their alleged unlawful actions conducted elsewhere. Because plaintiffs have made numerous specific allegations against corporate officers James Moran, Al Hendrickson and John McNally which show some direct, personal involvement in some decision or action which is causally related to the plaintiffs' alleged injuries, the Court finds that these defendants are amenable to suit here and accordingly extends personal jurisdiction over them.

## II. VENUE

The Individual Defendants next move to dismiss this action as to them for improper venue. Because the Court dismissed Patricia Moran, Janice Moran, James Moran, Jr. and Arlene McNally for lack of personal jurisdiction, it need address the venue ques-

---

16. The individual employee at issue in *Columbia Briargate* allegedly committed the unlawful activities in South Carolina.

matter to hold that an individual working for that same corporation, who has never been present in the distant forum with regard to a corporate transaction, and has no reason to foresee responsibility in the forum state, has a similar connection [or 'contacts'] with the distant forum." *Columbia Briargate* at 1060–1061.

tion only as to James Moran, Al Hendrickson and John McNally.

Plaintiffs who establish personal jurisdiction must additionally meet venue specifications. *Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant,* 760 F.2d 312, 315 (D.C.Cir.1985). Venue statutes serve "the purpose of protecting a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred." *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1576 (Fed.Cir.1990), *cert. den'd,* —— U.S. ——, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). *See also Leroy v. Great Western Union Corp.,* 443 U.S. 173, 185–87, 99 S.Ct. 2710, 2717–18, 61 L.Ed.2d 464 (1979) (superseded by statute).

 When venue is challenged, it is plaintiffs' burden to prove that venue is proper in the forum state. *Bartholomew v. Virginia Chiropractors Ass'n,* 612 F.2d 812, 816 (4th Cir.1979), *cert. den'd,* 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980). In a case with multiple claims, plaintiffs have the burden of establishing that venue is proper as to each claim. *VDI Technologies* at 92. Additionally, plaintiffs must establish that venue is proper as to each defendant. *Eaby v. Richmond,* 561 F.Supp. 131, 140, n. 2 (E.D.Pa.1983) (*but see* fn. 19).

Plaintiffs assert that venue is proper as to these three defendants pursuant to 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b)(2). The Court will first analyze whether venue properly lies in this district pursuant to 28 U.S.C. § 1391, the general venue statute.

### A. Section 1391

When federal jurisdiction is not founded solely on diversity of citizenship, as is the case here, § 1391(b) provides a basis for establishing venue. Plaintiffs assert that § 1391(b)(2) is applicable here. Section 1391(b) provides, in pertinent part:

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only i[n] ... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated....

Because the instant action is not primarily one in which property is the subject of the action, venue will be proper only if a substantial part of the events giving rise to plaintiffs' claims occurred in South Carolina.

 Section 1391(b) was revised, effective December 1, 1990, pursuant to the Judicial Improvements Act of 1990, Pub.L. No. 101–650, § 311 of Title III. Prior to the revision, § 1391(b)(2) stated, in pertinent part:

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district ... in which the claim arose.

The legislative history regarding the change makes it clear that the new language was intended to avoid some of the difficulties that had been encountered by courts in trying to determine the district in which the claim arose. *Sidco Indus., Inc. v. Wimar Tahoe Corp.,* 768 F.Supp. 1343, 1346 (D.Or.1991).[17] The earlier provision exasperated many courts as they struggled to devise a workable test to determine where the claim arose in particular cases. Three basic tests emerged as a result. The most popular is referred to as the "weight of the contacts" test, which would find venue proper in the district in which the contacts weigh the most heavily, "with an eye to determining the availability of witnesses, the accessibility of other relevant evidence and the convenience of the defen-

---

**17.** While this may have been the intent of the new legislation, at least one commentator remains dubious that this objective was met. John B. Oakley, Professor of Law at the University of California, Davis, opined that, "Congress's new basic venue provisions seem certain to invite recurrent district court litigation.... The [new] test hardly comes warranted as less likely to be 'litigation breeding.'" Oakley, "Recent Statutory Changes in the Law of Federal Jurisdiction and Venue," 24 U.C.Davis L.Rev. 735 (Spring, 1991).

dant." Another test, used particularly in tort cases, was the place of injury test.[18] Finally, some courts applied a test known as the American Law Institute test. This test is almost identical to the newly implemented § 1391(b)(2). It provides that venue is proper in any district where "a substantial part of the events and omissions giving rise to the claim occurred." *Obee v. Teleshare, Inc.*, 725 F.Supp. 913, 917 (E.D.Mich.1989), *quoting* ALI Study of the Division of Jurisdiction Between the State and Federal Courts, § 1303, 1314 (1969).

Although some courts still appear to apply the weight of the contacts test when deciding whether venue is proper under § 1391(b)(2), and the parties look to such factors in making their arguments in this case, this Court believes that under the new provision, the Court should only look to where a substantial part of the events and omissions giving rise to the claim occurred.[19] With this in mind, the Court turns to consideration of whether venue is proper in this District under the new rule.[20]

■ In attempting to determine what the events are in this case, where they took place, and whom they involved, the Court finds that plaintiffs have once again failed to assist this Court in ferreting out the facts relevant to this inquiry. Plaintiffs do not mention even one substantial event that allegedly took place in South Carolina in their Memorandum. Given this inadequacy, the Court must again turn to the Amended Complaint. The Amended Complaint alleges violations of RICO and state law claims of unfair trade practices, breach of contract and fraud. The Court finds the Amended Complaint to be quite unhelpful as an aid for determining proper venue under § 1391(b)(2). The following allegations are the only specific facts asserted by plaintiffs which refer to specific locations of events—either substantial or not—upon which their claims are based.

In the Amended Complaint, the Court finds (ignoring all unspecific, hyperbolic and conclusory allegations) that the corporate defendants' headquarters are located in Deerfield Beach, Florida and that the Individual Defendants work or worked there; that most negotiations with SET regarding the purchase of Magic Toyota took place in Florida, where Mr. Jones was part owner of another dealership at the time; that the only visits by JM Family employees occurred when non-party SET employee Dennis Puskaric travelled with Mr. Jones to Beaufort to visit what became the Magic Toyota dealership and when two WOFCO employees visited the Beaufort dealership to retrieve a check after conducting an audit; that an important meeting between Mr. Jones and James Moran apparently occurred in SET's Florida offices;[21] that in breaching the finance agreement, Mr. Jones had much contact with WOFCO employees, only a few of which are alleged to have been with a WOFCO office in Columbia, South Carolina; that WOFCO, SET and James Moran conspired to breach the agreement, but there is no allegation as to where such conspiracy took place; that SET conducted a false reporting scheme, known as the "WOLI program" and the TLC extended warranty program, apparently devising and implementing the programs at its Florida offices; that dealers learned of the unlawful WOLI program by way of meetings

---

18. A corollary test, urged by plaintiffs even in light of the new statutory provision, is the economic effect test, which provides for venue where plaintiffs' business was economically injured. This approach was discredited by the Supreme Court in *Leroy*. In that case, the Court held, "such a reading of § 1391(b) is inconsistent with the underlying purpose of the provision, for it would leave the venue decision entirely in the hands of plaintiffs, rather than making it 'primarily a matter of convenience of litigants and witnesses.'" 443 U.S. at 186–187, 99 S.Ct. at 2718.

19. Although the general rule is that venue must be found to be proper as to each defendant, the new test enumerated in § 1391(b)(2) appears to nullify that general rule, due to its change in focus from contacts to events.

20. In analyzing the issue, the court relies on pre-Act decisions which applied the almost identical ALI test, since few post-Act decisions exist.

21. It is assumed that the meeting took place outside Beaufort because the Amended Complaint, after discussing the meeting, states, "Upon arriving back at Magic Toyota ..."

with JM Family employees, but the only meeting location specified was one in North Carolina; that the location of tent sales, which plaintiffs claim consisted of a forum for conducting unlawful practices, are unspecified with the exception of a reference to one sale in Georgia and another in North Carolina; and that defendants formed an enterprise for the unlawful purpose of distributing vehicles, financing the vehicles and selling after market products and services to purchasers of the vehicles in many southeastern states, including South Carolina.[22] The remaining counts contain no specific allegations regarding the occurrence of significant events in South Carolina, but continue to merely make vague contentions that defendants harmed plaintiffs in South Carolina.

In summary then, plaintiffs claim that defendants breached financing agreements and an agreement to permit Mr. Jones to relocate his dealership; that defendants through false reporting schemes and other unlawful activities, committed unfair trade practices, fraud and violations of RICO. Although plaintiffs fail to specify where most of the alleged unlawful activities occurred, the Court deduces from a thorough and careful reading of the Amended Complaint that the events taking place in South Carolina consisted of a trip by a SET employee with Mr. Jones to the Beaufort dealership; and some communications between a Columbia WOFCO office and Mr. Jones in Beaufort. The Court makes the assumption that many of the unspecified mailings and telephone calls went to Beaufort. The events that did not occur in South Carolina include all of the initial negotiations between defendants and Mr. Jones, the alleged scheming by defendants, the only known meeting between James Moran and Mr. Jones, defendants' many alleged contacts with non-South Carolina dealers, communications between JM Family companies and TMS, and the tent sales.

Upon review of these allegations and an analysis of whether the events alleged to take place in South Carolina constitute significant events sufficient to establish venue here under newly revised § 1391(b), the Court concludes that venue is improper here. With the exception of two visits by SET and WOFCO employees, and the presence of a WOFCO office in South Carolina, where some of WOFCO's unlawful activities allegedly occurred, the only other events alleged to take place in South Carolina consist of letters and phone calls made to the Beaufort dealership which were in furtherance of defendants' unlawful activities.

The existence of a WOFCO office in South Carolina is the most significant contact alleged. However, WOFCO also has a Florida office and plaintiffs fail to specify which of WOFCO's unlawful activities were performed in South Carolina and which were performed elsewhere. At most, substantial events regarding plaintiffs' breach of the WOFCO financing agreement claim can be found to have occurred in South Carolina.

However, the gravamen of plaintiffs' complaint is the so called false reporting scheme. It appears from the Amended Complaint that SET and the other corporate defendants conducted most, if not all of its activities regarding this scheme at their offices in Florida. The remaining events—the two visits and the unspecified phone calls—do not constitute a substantial part of the events giving rise to the claims. *See Sunray Enterprises, Inc. v. David C. Bouza and Assoc's*, 606 F.Supp. 116, 118 (S.D.N.Y.1984) (where the court considered two visits to the forum state to be insignificant); *Dody v. Brown*, 659 F.Supp. 541, 551 (W.D.Mo.1987) (where the court looked to where the mailings originated) and *Follett College Stores Corp. v. Fernandez*, 587 F.Supp. 1051, 1053 (N.D.Ill.1984) (where the court held that use of the mail

---

**22.** Plaintiffs do make two specific allegations regarding events that took place in South Carolina. They allege that defendants bribed witnesses in South Carolina and made illegal campaign contributions in South Carolina. Plaintiffs do not identify to whom these bribes and contributions were made. Even if these allegations are true, without any explanation of how these events are relevant to this case, the Court cannot find that they constitute significant events for venue purposes.

and telephone into the district were insufficient).

On the other hand, most of the significant events appear to have taken place in Florida. Mr. Jones negotiated with defendants in Florida (see *Broadcasting Co. of the Carolinas v. Flair Broadcasting Corp.*, 892 F.2d 372, 377 (4th Cir.1989); *Lyons S & L Ass'n v. Westside Bancorporation*, 636 F.Supp. 576, 583 (N.D.Ill.1986), aff'd, 828 F.2d 387 (7th Cir.1987) in which preliminary negotiations, discussions and acceptance of agreements were considered by the courts to be significant events for venue purposes); and *Dody* at 551) defendants' allegedly unlawful scheme must have taken place primarily in Florida, at their offices (see *Payne v. Marketing Showcase, Inc.*, 602 F.Supp. 656, 660 (N.D.Ill.1985) (where the court looked to the location where defendants ran their corporate affairs and therefore must have planned their schemes)); and Mr. Jones apparently met with James Moran in Florida. Accordingly, the Court finds that, with the possible exception of the breach of contract claim regarding WOFCO financing, a substantial part of the events giving rise to plaintiffs' claims did not occur in South Carolina, but did occur in Florida. Accordingly the Court finds that venue is improper here, but is proper in the Southern District of Florida.

### B. Section 1965

■ Failing to find proper venue here pursuant to § 1391, the Court next turns to § 1965(a) and (b) of RICO to determine whether they provide an alternative source of venue in this District. The venue provisions of RICO are supplemental to those found in § 1391.

■ Section 1965(a) provides that venue is proper in any district in which a defendant (1) is found, (2) has an agent or (3) transacts his affairs. Plaintiffs contend that the latter two conditions provide venue in this case. In arguing that venue is proper under an agency theory, plaintiffs point out that they have "alleged that these Defendants are part of a RICO enterprise comprised of the nine corporate defendants and the seven individual defendants." Plaintiffs argue that the fact that:

> all these Defendants combine to form one enterprise for the purpose of carrying out its racketeering activity clearly demonstrates Plaintiffs' contention that significant collaboration and cooperation occurred among the Defendants. Agency principles clearly indicate that fellow collaborators are necessarily agents for each other when conducting their activities. Thus, § 1965(a) makes this Court a proper venue for this action.

Plaintiffs' Memorandum, page 29.

This is the extent of plaintiffs' argument regarding agency. Even accepting plaintiffs' claims as true, plaintiffs have provided this Court with no basis for finding agency in South Carolina. Plaintiffs' assertions beg the question. Did the "racketeering activity" and the "significant collaboration and cooperation," whether by agents of defendants or the defendants themselves, occur in South Carolina or in some other forum? Without any facts to suggest that any of the "fellow collaborators" were in South Carolina, this Court cannot find agency as a source of venue.[23]

■ Plaintiffs next argue that these defendants transacted business in South Carolina, thus subjecting themselves to venue in this district. The term "transacts his affairs" was drawn from § 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and has been interpreted to require that a defendant regularly transacts business of a substantial and continuous character within the district. *Obee* at 916; *Abeloff v. Barth*, 119 F.R.D. 315, 326 (D.Mass.1988); *Dody* at 544–45; and *Miller Brewing Co. v. Landau*, 616 F.Supp. 1285, 1288 (E.D.Wis. 1985). Accordingly, it is plaintiffs' burden to show that each of these defendants has regularly engaged in some significant and substantial activity *in* the District of South Carolina in order to prove that venue is proper under § 1965(a).

---

**23.** Furthermore, in order to accept plaintiffs' agency argument, the Court would have to embrace a co-conspirator theory of venue, something this Court is unwilling to do at this time.

Plaintiffs and defendants disagree as to whether "transacts his business" refers to an individual defendant's transaction of personal business or his transaction of business on behalf of his corporate employer. Plaintiffs argue that business transacted in this District on behalf of the corporate defendants is sufficient for venue purposes, while defendants argue that the Court may look only to the personal business transacted by defendants. If defendants' contention is true, then venue cannot be laid under § 1965(a), for each defendant has submitted an affidavit, in which he testified that he has transacted no personal business in South Carolina and plaintiffs have offered no evidence to the contrary.

Defendants rely primarily on *Payne, Medoil Corp. v. Clark,* 753 F.Supp. 592 (W.D.N.C.1990) and *Bulk Oil (USA) Inc. v. Sun Oil Trading Co.,* 584 F.Supp. 36 (S.D.N.Y.1983) in support of their contention. In those cases, the courts held that to rule that venue is proper as to an individual who conducts business only on behalf of his employer would be contrary to the express language of the statute which states that venue is proper in the district in which a defendant transacts *his* affairs. *Bulk Oil* at 39; *Medoil* at 599; and *Payne* at 659.

This Court declines to apply such a blanket interpretation to the "transacts business" phrase. While the Court agrees that it should look only to the personal affairs transacted by most employee-defendants, the Court will look to the transaction of corporate affairs by a defendant who has such a large stake in the corporation that he is in effect transacting his own affairs. The court in *Miller Brewing* adopted a similar rule. In that case, the court refused to extend the holding of *Bulk Oil* to the circumstances in *Miller Brewing.* The court held that where defendant employees enjoyed positions within the business they operated such that the affairs of the business were, in reality, their own affairs, any

distinction made between their affairs and those of the employer would be superficial and misleading. *Miller Brewing* at 1289.[24]

*Bulk Oil* and its progeny rely on the fiduciary shield doctrine as a basis for their decisions to look only to an employee defendant's personal transactions of business. Having already rejected the fiduciary shield doctrine as a means of defeating personal jurisdiction in this case, this Court is dissuaded also from using it as a basis for finding no venue.

Applying the *Miller Brewing* test to this case, the Court finds that James Moran, as majority shareholder and a director of the corporate defendants, enjoys such a position within the business he operates so that the affairs of the business are his own affairs. However, the Court finds that plaintiffs have offered insufficient facts from which the Court may draw such conclusions as to Mr. Hendrickson and Mr. McNally.

In order to prove that venue is proper as to James Moran under § 1965(a), the Court must determine whether the JM Family companies regularly transact business of a substantial and continuous nature in South Carolina. As was true regarding the issue of personal jurisdiction, this Court once again is unable to find any specific allegations or affidavits suggesting that the JM Family companies conduct business of a substantial and continuous nature in this District. Plaintiffs merely allege that defendants acted unlawfully, thereby causing the plaintiff dealership, located in South Carolina, to go out of business. Plaintiffs do not specify the number of visits, phone calls or letters sent by defendant agents to South Carolina and specifically allege only two visits by agents to Beaufort. Other than these allegations, plaintiffs' Amended Complaint is void of anything concrete upon which this Court can rely to support a finding of substantial and continuous business in this District.

---

**24.** The *Miller Brewing* court also refused to look to the transaction of an employee defendant's personal business where the corporation appears to have been a grossly undercapitalized venture which had since gone bankrupt, stating that it would set a bad precedent of allowing corporate officers who transacted affairs on behalf of a shell corporation to avoid application of the venue provisions of § 1965(a) to themselves. *Miller Brewing* at 1289.

Furthermore, plaintiffs' Memorandum as to the "transacting business" argument states only, "Defendants in the case at bar have unquestionably transacted their illegal and fraudulent affairs in South Carolina, and, therefore, a South Carolina federal district court is clearly an appropriate venue." Memorandum at pp. 28–29. The Court cannot imagine a more conclusory and vacuous "argument" than that given by plaintiffs, and without more, this Court has no choice but to find that plaintiffs have failed to meet their burden of proving that venue is proper as to James Moran under § 1965(a). Because the Court need only look to the personal business transacted by John McNally and Al Hendrickson, and because plaintiffs have failed to even attempt to produce evidence—or even make allegations—to counter these defendants' affidavits stating that they have transacted no personal business in this State, the Court rules that venue is not proper as to these defendants under § 1965(a) either.

Although venue cannot be laid here pursuant to § 1965(a), the Court may find venue to be proper pursuant to § 1965(b) if "the ends of justice" so require. Just as the Court considered the availability of an alternative forum to be a significant factor in its analysis of personal jurisdiction under § 1965(b), it considers it an important factor for venue purposes. Because this Court finds that the Southern District of Florida is a proper venue in this case as to these defendants, and because none of the other venue statutes provide proper venue as to these defendants in this District, the Court finds that the ends of justice do not require finding proper venue here.

### III. DISMISSAL VS. TRANSFER

■ Defendants ask this Court to dismiss this action as to James Moran, Al Hendrickson and John McNally, if it should find improper venue. However, it is within this Court's discretion to transfer a case if it finds that venue is improper in its forum, but proper elsewhere. 28 U.S.C. § 1406(a) states that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer

such case to any district or division in which it could have been brought." Having found that the instant action was filed in the wrong district as to James Moran, Al Hendrickson and John McNally, and finding that plaintiffs' claims could have some merit, the Court accordingly rules that it is in the interest of justice to transfer, rather than dismiss this action as to these defendants.

■ Because the necessary result of this decision is to create two separate actions—one against the corporate defendants here and one against the Individual Defendants in Florida—which should be tried together, the Court will, *sua sponte* consider whether the action pending in this Court against the remaining defendants should also be transferred to the District of Florida, pursuant to 28 U.S.C. § 1404(a). *See Feller v. Brock,* 802 F.2d 722, 729, n. 7 (4th Cir.1986) (where the court held that although a motion by one of the parties is ordinarily required for transfer, the district court may consider the possibility of transfer *sua sponte* ).

Section 1404(a) states, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." In *Feller,* the Fourth Circuit stated that if the matter of transfer is raised *sua sponte,* the parties deserve an opportunity to be heard before a decision is rendered. *Feller* at 729, n. 7. The Court accordingly invites the parties to submit memoranda addressing this issue no later than February 7, 1992. The Court will hold the motion for summary judgment in abeyance until it rules on its own motion for transfer of venue. It is, therefore,

ORDERED that plaintiffs' claims against defendants Janice Moran, Patricia Moran, James Moran, Jr. and Arlene McNally be dismissed for lack of personal jurisdiction. It is further

ORDERED that plaintiffs' claims against defendants James Moran, John McNally and Al Hendrickson be transferred to the Southern District of Florida. It is further

ORDERED that the remaining parties in this action submit memoranda regarding whether this action should be transferred to the Southern District of Florida no later than February 7, 1992.

IT IS SO ORDERED.